FILED

2010 Dec-14  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **TOMORROW HUDSON,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:09-cv-920-JHH** |
| **BLUE CROSS BLUE SHIELD** | ) | |
| **OF ALABAMA,** | | |
| | ) | |
| **DEFENDANT.** | | |

## MEMORANDUM OPINION

The court has before it the June 28, 2010 motion (Doc. # 21) of Defendant Blue Cross Blue Shield of Alabama (hereinafter "Blue Cross" or "Defendant") for summary judgment.  Pursuant to the court's orders of June 29, 2010 (Doc. #29) and July 26, 2010 (Doc. #31), the motion (Doc. #21) for summary judgment is now under submission and is considered herein without oral argument.

Having considered the briefs and evidentiary submissions, the court finds that Blue Cross's motion for summary judgment is due to be granted for the reasons outlined below.

## I.      Procedural History

Plaintiff Tomorrow Hudson commenced this action on May 11, 2009 by filing

1

a two count complaint (Doc. #1) in this court, alleging race discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq*.  Specifically, Plaintiff asserts that Blue Cross failed to redress her complaints of a racially hostile working environment and subsequently terminated her employment in retaliation for having opposed illegal discrimination.  (*See* Doc. #34 at 1).

Defendant's June 28, 2010 motion (Doc. #21) for summary judgment asserts that no genuine issue of material fact exists and that Blue Cross is entitled to judgment as a matter of law as to all claims asserted against it.

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment.  On June 28, 2010, Blue Cross submitted evidence[1] (Docs. #23-28) in support of the motion and also filed a supporting memorandum brief (Doc. #22).  Plaintiff submitted evidence[2] (Docs. #35-37) in opposition to the motion for summary judgment on

---

[1] Defendant Blue Cross submitted: the deposition transcript of Tomorrow Hudson with exhibits (Exhibit A); the declaration of Barbara Hutchinson (Exhibit B); the deposition transcript of Amy Russell with exhibits (Exhibit C); the deposition transcript of Barbara Hutchinson with exhibits (Exhibit D); the deposition transcript of Jasmine Woods with exhibits (Exhibit E); the declaration of Jasmine Woods (Exhibit F); the deposition transcript of Heather Howard with exhibits (Exhibit G); the deposition transcript of Tricia Isbell with exhibits (Exhibit H); the deposition transcript of Angela Fincher with exhibits (Exhibit I); and the declaration of Donna Day Johnson (Exhibit J).

[2] Plaintiff submitted in support of the opposition to summary judgment: excerpts from the deposition transcript of Tomorrow Hudson (Exhibit A); excerpts from the deposition transcript of Amy Russell (Exhibit B); excerpts from the deposition transcript of Barbara Hutchinson (Exhibit C); Tomorrow Hudson's Performance Appraisal dated March 31, 2006 (Exhibit D); a letter dated May 22, 2006 signed by Amy Russell, Holly Cacciatore, and Tomorrow Hudson (Exhibit E); a letter

August 3, 2010 and on the same date filed an opposition brief (Doc. #34).  Finally, on August 10, 2010, Blue Cross filed a reply (Doc. #38) to Plaintiff's response in opposition to Defendant's motion for summary judgment.

## II.   Legal Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323.  Once the moving party has met her burden, Rule 56(e) requires the non-moving party to go beyond the

dated May 22, 2006 unsigned and titled "follow up meeting with Amy Russell and Holly Cacciatore at 3:30 p.m. " (Exhibit F); a handwritten note dated 5/23 (Exhibit G); excerpts from the deposition transcript of Jasmine Woods (Exhibit H); a letter dated June 14, 2006 titled "Meeting with Jasmine Woods (Associate Resources) (Exhibit I); handwritten notes dated June 13, 2006 at 1:30 p.m. (Exhibit J); a document titled "Rebuttal regarding my performance evaluation" dated April 24, 2006 (Exhibit K); excerpts from the deposition transcript of Tricia Isbell (Exhibit L); an email from Tricia Isbell to Jasmine Woods dated June 30, 2006 (Exhibit M); excerpts from the deposition transcript of Heather Howard (Exhibit N); excerpts from the deposition transcript of Angela Fincher (Exhibit O); an informational interview note dated July 6, 2006 (Exhibit P); the Associate Handbook (Exhibit Q); the Decision on Unemployment Compensation Claim dated September 25, 2006 (Exhibit R); excerpts from the deposition transcript of Sharon Heaton (Exhibit S); and a letter of determination from the Equal Employment Opportunity Commission dated September 30, 2008 (Exhibit T).

pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge her initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes

4

such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, she can satisfy her initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets her initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence

sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   Relevant Undisputed Facts[3]

### A.   Plaintiff's Employment History at Blue Cross

Plaintiff Hudson, an African American female, was hired by Blue Cross as a Customer Service Representative in February 1998.  In that position she fielded calls from individual policy holders regarding benefits, eligibility, and claims status.  (Hudson Dep. at 33-35).  In December 2000, Hudson was promoted to the position of Customer Service Specialist, and remained in that position until she voluntarily resigned from her employment with the company in January 2002.  (Hudson Dep. at 45-46, 53-54).

---

[3] If the facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick*, 2 F.3d at 1115.

Hudson submitted an application for (re)employment to Blue Cross on July 18, 2002, and resumed working at the company effective August 5, 2002 as a Customer Service Representative. (Hudson Dep. at 59-61, 63-64). While working in the Customer Service Department as a Customer Service Representative, Hudson was paid at a Grade 12 level, the highest grade achievable for a non-exempt position at Blue Cross. (Hudson Dep. at 77-78; *see also* Hutchinson Decl. at ¶ 3).

In 2004, Hudson applied for and received a transfer from her position as a Customer Service Representative in the Customer Service Department to a position as a Customer Accounts Representative in the Customer Accounts Department ("CAD"). (Hudson Dep. at 79-80). In the new position, Hudson served as the customer service contact for employer groups of Blue Cross policy holders, rather than providing customer service to individual policy holders. (Hudson Dep. at 80-81; *see also* Russell Dep. at 31-32). The Customer Accounts Representative position was classified as a Grade 10 job, but Hudson's pay was not decreased and she retained her Grade 12 classification. (Hudson Dep. at 79-82). Hudson did not consider the move a demotion, as she herself sought it out and considered herself to be better able to handle her own desk and deal with time management issues as an Accounts Representative as opposed to a Customer Service Representative. (Hudson Dep. at 80-82).

Hudson's problems as related to this lawsuit began after her move to the Customer Accounts Department.

**B.      Plaintiff's Employment in the Customer Accounts Department**

Upon her transfer to the Customer Accounts Department, Hudson began reporting to Amy Russell, a Caucasian female. (Russell Dep. at 43, 50-52, 55-56, 58-59). Both Hudson and Russell classify Hudson's first year of working under Russell's management as a success. (Hudson Dep. at 90). In her Performance Evaluation from 2005, Russell commented that Hudson seemed to enjoy her job and was conscientious, that Hudson worked well with her groups and seemed to develop a rapport with her peers. (Hudson Dep. at 91).

**1.      Amy Russell as a Manager**

Russell participated in management classes when she first became a management level employee. (Russell Dep. at 50-51). She attended a week-long class about performance management which focused on managing behaviors to get the results you wanted from your associates. (Russell Dep. at 52-53). She attended another week-long class titled "interactions management" which focused on communication issues such as styles, techniques, and interactions with associates. (Russell Dep. at 55-56). Russell does not recall any training on communication style and technique focusing on sensitivity towards gender and racial issues. (Russell Dep.

8

at 56). She received training on how to complete performance evaluations from peer

managers. (*See* Russell Dep. at 50, 57-58).

### 2.   Plaintiff's General Complaints about Amy Russell

During that first year in the Customer Accounts Department, Hudson recalls

that she made a complaint about Russell to Natalie Hill in Human Resources.

(Hudson Dep. at 93-94). The complaint did not have anything to do with race, but

rather Hudson was concerned that Russell made a remark during a luncheon about

Hudson's pay grade. (Hudson Dep. at 93-95, 300). Hudson and other Customer

Accounts Representatives were having lunch with Russell off the corporate premises,

and in response to an observation by Hudson that the company should raise the

Customer Accounts Representatives' pay grades to a 12 rather than a 10, Russell

observed that Hudson's pay grade was already a 12. (Hudson Dep. at 231-232; Exh.

31 to Hudson Dep.).

Hudson continued to feel "negative energy" from Russell. (Exh. 31 to Russell

Dep.). In September 2004, Hudson was taken aback when, after requesting from

Russell that she be permitted to leave work early to pick up a child from school,

Russell "abruptly replied" in front of another manager, "You are the only one with

the most requests this month to take off!" (Exh. 31 to Russell Dep.). During the

same incident, Russell told Hudson that Hudson needed to key in time for an early

departure one Friday.

> I then said to Amy that, "I did not leave early Friday; I walked down to the store to get my favorite mentos candy on the 1st floor and noticed they were closed."  Heather Howard was there with me to witness this.  She then replied that I was gone over 10 minutes.  I then asked Amy, "If she was accusing me of abusing time?"  She then stated that she addresses issues as they come up with each employee individually.  I then stated, "Okay, you are accusing me of abusing time when I was not."

(Exh. 31 to Hudson Dep.).  Hudson further testified that Russell was generally more lenient with Caucasian employees who sought time away from the office than she was with African American employees.  (Hudson Dep. at 96-99).  "She [Russell] made a big deal when it came to African-Americans versus the Caucasian whites, it was no problem, 'Oh, sure, you can take off.'" (Hudson Dep. at 98-99).

> "Asking [African Americans] why do you need this off, you need to be here; just making a big deal as far as us being here, doing our work.  But when it came to the white Caucasian, her demeanor was different like sure, go ahead, no problem, I will put you down.  But it was always questions asked of us when we requested time off."

(Hudson Dep. at 100).[4]   Hudson also believes that African Americans in her department were given heavier work loads than their Caucasian counterparts.

---

[4]  Hudson does not allege that Russell ever prohibited her from taking time away from work when she asked to do so.  (Hudson Dep. at 102-104).  It is undisputed that Hudson did not receive any discipline for attendance-related issues when she reported to Russell.  (Hudson Dep. at 308-309).

(Hudson Dep. at 226).

Hudson observed Russell's personal interactions with African American and Caucasian employees to be different.   "[T]he demeanor and the way she communicated in her tone and speech with African Americans versus white Caucasians was different."  (Hudson Dep. at 169-70).  Hudson elaborated:

> She would come in and talk with, for instance, Angela Fincher, she sat on the side of me.  She would come in and watch me come in to my desk at her seat and look at her watch as I walk in, then go over to Angela Fincher's desk and talk with her for twenty minutes at a time while she just said, "Hey Tomorrow, you are here," and talk with her, so that is a difference.

(Hudson Dep. at 170).

> As far as her tone when she come and addressed me about concerns, it would be like more so, "I need you to answer this question.  I had a customer complaint of this problem" or anything, just a tone related issue.  Any petty little pet peeve, things such as emails, going back and forth, being team oriented with customers – with our team, she did not want me to do that. One time she even asked me who do I think I am, who do you … think you are, basically, as far as if I was thinking I was above her or not, but I – you know, just an employee.  So things of that nature.

(Hudson Dep. at 172-173).

Hudson was offended when Russell said to her "[Y]ou are so slim, you know, I hate you, you are just so skinny and we are the same age and I am just so fat." (Hudson Dep. at 174-175).   Hudson did not believe that Russell was paying her a

11

compliment, but rather concluded that Russell literally hated her because of her slender figure. (Hudson Dep. at 175-176). Hudson was offended again when Russell requested to touch Hudson's hair because she "had never had the opportunity to touch African-American hair before . . ." (Hudson Dep. at 265-266).

Hudson believes that these situations evidence Russell's prejudice toward African American employees. However, they were not the catalyst for this lawsuit. That came with Hudson's 2006 Performance Evaluation.

## C.   Plaintiff's 2006 Performance Evaluation

In Hudson's Performance Evaluation for 2006, Russell made the following observation:

> Earlier in the rating period, Tomorrow had a few groups to request a new CAD rep due to an abrupt or rude tone on phone calls. Some also expressed frustration over incomplete or untimely change requests. These complaints occurred within a relatively brief period of time, and since I have received compliments regarding Tomorrow's service. Tomorrow does possess good interpersonal skills which she will need to use when dealing with frustrated customers.

(Hudson Dep. at 141-142; Exh. 24 to Hudson Dep.). The referenced complaints came from four customers, two of which complained about Hudson because she interrupted them on the phone, spoke to them in a rude tone of voice, and in one case suggested they should use a different representative because she didn't like their "attitude."

(Russell Dep. at 120-121, 138-140; Hudson Dep. at 141-148 and Exhs. 25, 27 to Hudson Dep.).

Hudson does not deny that she experienced the customer complaints as described in her 2006 Performance Evaluation and admits that she could have handled the calls at issue differently. (Hudson Dep. at 143-144, 146-147). However, given the fact that the complaints had occurred approximately six months prior to her performance evaluation being prepared, Hudson felt they should not have been included. Instead, Hudson believes that she should have been counseled concerning the complaints at the time they occurred so that she could be given an opportunity to improve. (Hudson Dep. at 141-147).

After reviewing the evaluation, Hudson sent an email to Russell inquiring about the identity of the complaining customers, and requesting that Russell reconsider the contested verbiage because "this was not an instance of rudeness at all but a judgment call . . . As I recall the incident, I was not rude at all but handled the entire matter with a great deal of professionalism." (Hudson Dep. at 150-151; Exh. 25 to Hudson Dep.). Russell needed an extra day to respond to Hudson's request thoroughly, and on April 4, 2006 provided Hudson with a list of the four complaining customers: Gulf Coast Truck; Parsons, Wible, Brummal, and Alkire Architects, Inc.; McAleers of Birmingham; and Central Machine Works. (Hudson Dep. at 152-153;

13

Exh. 25 to Hudson Dep.).  The calls that prompted the complaints from two of the customers, Gulf Coast Truck[5] and McAleers, were captured in Blue Cross's quality control recording system.  (Hutchinson Decl., ¶ 4).

Hudson was dissatisfied with Russell's response, and emailed Barbara Hutchinson requesting a meeting.  (Hudson Dep. at 156-158; Exh. 25 to Hudson Dep.).  Russell had already informed Hutchinson that Hudson was unhappy about the verbiage of the 2006 evaluation, so Hutchinson arranged for a meeting for the three women on April 6, 2006, providing an opportunity to listen to the recorded calls and discuss the evaluation.  (Hutchinson Dep. at 43-45; Exhs. 26, 27 to Hutchinson Dep.). Hutchinson listened to the two recorded calls and was "astounded" at the unprofessional manner in which Hudson handled the calls.  (Hutchinson Dep. at 47-48; Exh. 27 to Hutchinson Dep.).   According to Hutchinson, Hudson was argumentative, told one of the customers that his "attitude" was causing her a problem, and talked "over" one of the customers so much that he had to ask "if he could talk."  (Hutchinson Dep. at 47-48; Exh. 27 to Hutchinson Dep.).  Hutchinson

---

[5] Hudson believed that the Gulf Coast Truck call referenced in the evaluation should not have been included for 2006.  Russell explained to Hudson that the call was not referenced on Hudson's 2005 evaluation because Russell only became aware of the call in February 2006, and she included Hudson's performance numbers through January 2006 in the previous year's evaluation.  (Hudson Dep. at 154-155; Exh. 25 to Hudson Dep.).

told Hudson during the meeting that she was considering further disciplinary action

against Hudson for the phone calls at issue, and mentioned that she believed Hudson

had been insubordinate to Russell during their initial discussion of the evaluation.[6]

(Hudson Dep. at 161-164).

Hudson testified first in her deposition that the meeting was not handled in a

discriminatory manner.  (Hudson Dep. at 163).  But shortly thereafter, Hudson said

that she "felt as though, if it was a Caucasian person, it would have been handled

---

[6] The testimony regarding the insubordination is this:

Q:    Okay.  Tell me a little bit more about the remark about being insubordinate.
A:    I went to Amy to discuss my – you know, the outcome of the performance evaluation.
      And I guess another manager reported – with me asking questions, and another
      manager reported to Barbara [Hutchinson] that I was talking rude to her or
      something, something to that nature.  I'm not – you know, for sure on the words,
      exact words.  But she included this in this write-up here saying that I was being
      insubordinate, and that threw up, you know, a red flag for me to contact Human
      Resources.

. . .

Q:    Okay.  It wasn't that you went into Amy's office with your hand on your hip holding
      your performance evaluation asking whether she was trained on how to administer
      performance evaluations, was it?
A:    Oh, no, I did not go in with my hands on my hips.  We were sitting down at her desk
      and I did ask her, with her being new, "Have you ever been trained on how to
      perform the performance evaluation?"  Her answer was "Yes."

Q:    Is it your custom to inquire as to your manager's training?
A:    No, but I am assertive, and I should be able to ask questions as they arise, as they
      come up.

(Hudson Dep. at 164-166).

differently.  I would not have been in that room with them." (Hudson Dep. at 167).

When asked to elaborate, she stated that "I wouldn't have been pulled in the office

about something with me questioning my performance evaluation if I was a white

Caucasian.  So feelings was there as related to black verus white." (Hudson Dep. at

167).  But Hudson does admit that the meeting was conducted at her own request and

has also admitted that she was not aware of any situations where Caucasian associates

in her area complained about performance evaluations and did not meet with

supervisors as Hudson had done.[7]  (Hudson Dep. at 167-168).

### D.    Plaintiff's April 10, 2006 Meeting with Jasmine Woods

At the close of the meeting with Hutchinson and Russell, Hudson felt the threat

of additional discipline due to the error and the insubordination, so she contacted

Jasmine Woods, an Associate Resources Specialist at Blue Cross.  (Hudson Dep. at

164).  Woods is an African American female whose job responsibilities include

serving as a resource for employment-related matters for Blue Cross associates and

managers, as well as conducting investigations of employee and manager complaints.

---

[7] The only evidence provided by Hudson of white co-workers who protested their performance evaluations was identification of an individual named Jason Henderson.  Hudson is unaware as to whether he was treated differently with regard to a change of verbiage in his performance evaluation and admitted that she was aware that he remained so dissatisfied with management's response to his complaint that he bid on a transfer to another department.  (Hudson Dep. at 301-302; Hutchinson Decl., ¶ 9).

(Woods Dep. at 18-20).

The meeting was scheduled and occurred on April 10, 2006.  Hudson complained to Woods that she disagreed with Russell's decision to include the verbiage in the 2006 Performance Evaluation which acknowledged four customer complaints.  (Woods Decl., ¶ 3).  Hudson also informed Woods that the accusation of insubordination was of concern to her, and the two discussed the possibility of an "interim performance evaluation."  (Hudson Dep. at 178-180).  At one point in her deposition testimony Hudson testified that she did not complain to Woods during the April 10, 2006 meeting that she suffered any conduct based on her race, but later testified that she could not remember whether she had provided Woods with any race-based complaints regarding her work conditions at that time.  (Hudson Dep. at 181-183).

### E.     Plaintiff's April 24 or 25, 2006 Performance Evaluation Rebuttal

On April 24 or 25, 2006, Russell met with Hudson and informed her that it had been decided that the contested verbiage on the performance evaluation would not be changed.  (Hudson Dep. at 194-195; Exh. 28 to Hudson Dep.).  At around the same time, Hudson provided Woods with a written summary of her notes, dated April 24, 2006, which referenced Hudson's continued complaint regarding Russell and the contested verbiage.  (Hudson Dep. at 184; Exh. 28 to Hudson Dep.).  The April 24

17

notes reiterate that Hudson was unhappy with the verbiage because she believed the calls should have been brought to her attention at the time that they occurred, and that her performance evaluation should reflect her yearly performance as a whole, rather than one-time occurrences. (Hudson Dep. at 185-186; Exh. 28 to Hudson Dep.). The April 24 notes also convey that Hudson met with Russell and Hutchinson, and that she apologized at that time for interrupting customers and for how she handled the calls, but stated that if rudeness to customers was an issue, it should have been addressed through disciplinary measures rather than through her performance evaluation. (Hudson Dep. at 186-87; Exh. 28 to Hudson Dep.). At no point do the April 24 notes provide any allegation that Hudson's complaint was in any way related to her race. (Hudson Dep. at 191-192; Exh. 28 to Hudson Dep.). Hudson testified that she could not recall what she discussed with Woods beyond the general complaint regarding the contested verbiage. (Hudson Dep. at 204-205).

## F.   May 22, 2006 Counseling

As of May 22, 2006, Hutchinson and Russell determined that, although Hudson had been told that the April 6, 2006 performance evaluation meeting should be considered a formal counseling, it would be necessary to reiterate the serious nature of that counseling to Hudson because she appeared to be unwilling to accept management's final decision to retain the contested verbiage. (Hutchinson Decl., ¶

4; Russell Dep. at 156-157; Hutchinson Dep. at 57-58; Woods Decl., ¶ 3).
Hutchinson and Russell believed that Hudson did not appreciate the seriousness with
which the Company viewed mishandling customer calls.  (Hutchinson Decl., ¶ 6;
Russell Dep. at 156-157).  Also, Hudson had taken it upon herself to send out several
emails to her co-workers in the area offering advice and/or instruction as to several
internal processes.  (Hudson Dep. at 214-215; Russell Dep. at 166-167; Hutchinson
Dep. at 64).  Though Hudson's intentions may have been to be helpful, the instruction
provided was either in error or only partially correct, and Hutchinson and Russell
preferred that Hudson seek management approval before sending out instructions to
her co-workers.  (Hutchinson Dep. at 64; Russell Dep. at 166-167; Hudson Dep. at
214-217).   Russell believed that the evaluation was fair and appropriately
documented, and Woods agreed.  (Russell Dep. at 188-189; Hutchinson Decl., ¶ 4;
Woods Decl., ¶ 4).

On May 22, 2006, Russell and Holly Cacciatore, the Management Candidate
in the Department, met with Hudson to administer a formal counseling.  (Hudson
Dep. at 205-206; Exh. 29 to Hudson Dep.; Hutchinson Decl., ¶ 6; Russell Dep. at
154).  In that meeting and the accompanying memo, Hudson is warned that she may
face formal discipline on issues both related to phone calls and unrelated thereto.
(Pl.'s Exh. E).

> Beginning immediately, Tomorrow cannot speak to her group customers in the manner as evidenced in the 2 phone calls that were reviewed. Should any more groups become disgruntled with her performance or behavior, Tomorrow will be formally disciplined. Should Tomorrow not deal professionally and tactfully with me or another manager, she will be formally disciplined. Should any future problems occur with Tomorrow's performance, attendance, behavior, or demeanor, she will be formally disciplined.

(Russell Dep. at 157). The Counseling Memo also stated that the Company considers it to reflect poorly on the performance of a Customer Accounts Representative when a customer is so angry because of an interaction with a Representative that he or she requests another representative. (Russell Dep. at 156; Hutchinson Dep. at 64; Hudson Dep. at 29).

Hudson perceived this memo as threatening, and again sought the advice of Woods. (Hudson Dep. at 221-222). Hudson provided Woods with a memo of Hudson's own creation (titled FYI Memo) documenting some of the matters discussed in the May 22, 2006 meeting including that Russell had advised Hudson that she must run all work related emails by Russell before sending them out to team members. (Hudson Dep. at 229; Pl.'s Exh. F). Hudson states her disagreement with that requirement. (Hudson Dep. at 214-215). She also describes the 2004 lunch salary discussion and describes another incident wherein Hudson asked to leave work early, and Russell remarked that Hudson had made more requests to take off work

that month than anyone else in the area, and also mistakenly assumed that Hudson had left work early the previous Friday when she had not. (Exh. 31 to Hudson Dep.).

During the meeting, Hudson informed Woods that she wanted to tape future conversations between her and Russell and/or Hutchinson. (Hudson Dep. at 240; Exh. 33 to Hudson Dep.; Woods Dep. at 119-120). Woods testified that she informed Hudson that any such recording on the premises was against company policy, but Hudson recalls Woods telling her that it would be fine for her to record such conversations so long as the recorded party was made aware.[8] (Hudson Dep. at 240; Exh. 33 to Hudson Dep.; Woods Dep. at 120; Woods Decl., ¶ 7). Hudson admits that she was aware of the Company's policy prohibiting recording on other associates on the premises, however, and agrees that Woods encouraged her not to record conversations with her managers, but rather to continue documenting their conversations in the form of written notes. (Hudson Dep. at 241-242; Woods Decl., ¶ 7).

Hudson also used the meeting to ask for Woods' help in "getting . . . removed from being under Amy Russell for I feel retaliation will be done to me." (Pl.'s Exh. F). When asked whether she informed Woods that she felt she was experiencing a

---

[8] Because this is a disputed fact, Hudson's version is taken as true for purposes of summary judgment.

hostile work environment based upon her race, Hudson testified:

> I think I gave her – I can't recall if I said race or just hostile work environment . . . [r]ace was a factor, she knew about race.  She knew about, you know, the people – the demeanor, about the blacks and the whites are different in the area, and that is where the investigation was to begin, but it never did so . . .

(Hudson Dep. at 225).  Woods made notes of her May 23, 2006 meeting with Hudson and documented that Hudson felt "retaliated against," and was "walk[ing] on pins/needles" due to a "hostile work environment."  (Pl.'s Exh. G).

According to Hudson, Woods agreed that the meeting and counseling document were threatening, and stated that she would speak to her manager, Tina Shaw, as well as Hutchinson, about the situation.  (Hudson Dep. at 221-222).  Other parts of Hudson's testimony are contradictory.  At one point, Hudson stated that Woods informed her that Hutchinson "went above her manager, Shaw, and went to Sharon Heaton I believe . . . to see about what she could do to get rid of me.  Those were her words."  (Hudson Dep. at 222).  When asked further about this remark, Hudson testified, "Under oath I will not say 'get rid of me,' but basically do about me and the situation that I have brought up with them."  (Hudson Dep. at 223).  When asked if what Woods actually told her was that Hutchinson had a conversation with Heaton about the situation, Hudson responded, "well, my interpretations is how she related to me is that she basically went above her manager, Tina Shaw, to see how she

22

can get rid of me.  Those were my interpretations of it.  The words that she used was that 'Barbara went above my manager and went to Sharon about this matter, so we are going to have to just talk with them and see what we are going to have to do from there."  (Hudson Dep. at 223-224).

Almost immediately after this meeting with Woods, Hudson left Blue Cross for a brief medical leave, lasting from approximately May 24, 2006 through June 8 or 9, 2006.  (Hudson Dep. at 235-236).

## G.    Focus Group Meetings Conducted by Barbara Hutchinson Concerning Amy Russell

Just as associates at Blue Cross receive yearly performance evaluations from their managers, managers at Blue Cross are evaluated by their subordinate associates in the form of yearly, anonymous surveys.  (Hutchinson Decl., ¶ 7; Hudson Dep. at 246-247).  Due in part to the fact that Russell received below average survey scores, Barbara Hutchinson decided to conduct one-on-one meetings with all of Russell's subordinate associates so that she could better assess their concerns.  (Hutchinson Dep. at 65-66; Hutchinson Decl., ¶ 7).  The focus group meetings were designed to address morale within the department and to help Russell improve as a manager, while at the same time providing the associates with an opportunity to present Hutchinson with their concerns and feedback regarding Russell.  (Hudson Dep. at

244-246).  When Hudson returned from medical leave, she met with Hutchinson on June 13, 2006.  During the meeting, Hutchinson asked Hudson a series of questions regarding Russell's management style and Hudson testified that, to her knowledge, she provided truthful responses to Hutchinson.  (Hudson Dep. at 246).

Hudson took notes during the meeting with Hutchinson, having been instructed by Woods to document the meeting.[9]  (Hudson Dep. at 239-242; Exh. 32 to Hudson Dep.).  Hutchinson testified in her deposition that Hudson took notes "throughout the interview," which no other associate did.  (Hutchinson Dep. at 73).  Hudson's notes indicate that she replied:

> I know that with my situation with (Russell) and my performance evaluation, she had distanced herself.  Amy has a standoffish attitude where before she used to come to my desk to communicate well, until I have a concern . . .

> In response to a question about what Russell should discontinue doing as a manager, Hudson's notes indicate that she replied: "Taking things personal our concerns or issues we bring to her.  Stop making us feel like we are not worth anything.  She makes us feel like we are not appreciated.  Stop looking at the negative because anyone can find fault."

---

[9] Hudson denies having audio recorded the June 13 meeting.  (Hudson Dep. at 240-243).  The detailed notes that she took reflect a grammatically correct reiteration of Hudson's responses.  (Exh. 32 to Hudson Dep.).

**H.     Plaintiff's June 14, 2006 Meeting with Jasmine Woods**

Hudson met with Woods the day after her focus group meeting and presented Woods with four pages of notes taken the previous day.  (Hudson Dep. at 252-253; Exh. 32 to Hudson Dep.; Woods Decl., ¶ 7).  In light of Hudson's earlier inquiry as to whether she was permitted to record meetings with management, and Woods' belief that the typed notes with explicit replies resembled a transcript, Woods inquired as to how Hudson was able to take such detailed notes of her meeting with Hutchinson.  (Woods Dep. at 119-120; Hudson Dep. at 239-240; Woods Decl., ¶ 7).  Hudson replied that she had written very quickly and asked Hutchinson to slow down when she was unable to keep up.  (Woods Dep. at 86-86; Woods Decl., ¶ 7).

Hudson used the meeting with Woods to discuss "how blacks were treated in the area, how – I mean, several things were discussed."  (Hudson Dep. at 253).  In response to Hudson's concern, Hudson testified that Woods responded "she was going to start the investigation based on my allegations [of a hostile work environment against Russell] . . . And from that point forward, I mean, we left, and I was awaiting the investigation."[10]  (Hudson Dep. at 253; Woods Dep. at 70).

_____

[10] According to Woods, she informed Hudson during the meeting that she did not have sufficient information from her upon which to base an investigation regarding a hostile work environment, and that the examples provided by Hudson at that point were either insufficiently specific, or dated back to 2004, and did not support her complaint of a hostile work environment, in any event.  (Woods Dep. at 26, 60-61, 73; Exhs. 27, 28 to Woods Dep.).  Woods testified that she

Hudson documented the meeting with Woods.  (Exh. 33 to Hudson Dep.).

Those notes reveal that Hudson felt "Amy Russell is now putting me under a 'hostile'

work environment and that Ms. Hutchinson and Holly Cacciatore both personally

visited human resources to question Ms. Hudson's medical leave."  (Exh. 33 to

Hudson Dep.).  Another section of the notes indicate:

> I also stated that we as blacks feel like we are being treated differently in that area.  I advised her of some of the concerns another employee had with race in the area.  The majority of the area feels this way but is afraid to speak out in fear of losing their jobs.  I personally was attacked when they found out that I do not eat pork or beef because of my religious beliefs.  My manager constantly questioned my clothing and whether or not it's new. She has even gone as far as questioning the texture of African American hair.  In October 2004 at approximately 09:30 am, Amy Russell actually asked to touch my hair because it looked so soft and silky, I had just gotten my hair cut and styled.  She also stated that she never had the opportunity to do this before with a person of my race.

(Exh. 33 to Hudson Dep.).  Hudson admits that none of the written materials she

provided to Woods contained any allegations regarding race discrimination of any

---

requested Hudson provide her with any additional information that she may have that would support such a complaint, and according to her, Hudson referred her back to the contested verbiage in her 2006 evaluation. (Woods Dep. at 26, 60; Exh. 28 to Woods Dep.; Hudson Dep. at 257-258).  Woods concluded that Hudson's complaint was essentially an informal grievance based on a personality conflict with her manager.  (Woods Decl., ¶ 5).  Woods recalls telling Hudson that she would wait to learn the outcome of Hutchinson's focus group meetings.  (Woods Dep. at 83-84; Exh. 28 to Woods Dep.).

Because Hudson disputes these points, they are stated above in the manner most favorable to Hudson.

kind.  Rather, the notes she prepared of the meeting with Woods were described by

Hudson as "a write-up of me documenting everything that Jasmine and I discussed

on June 14, 2006."[11]  (Hudson Dep. at 262-263; Exh. 33 to Hudson Dep.).

## I.     Plaintiff's Suspension from Employment at Blue Cross

At some point after the focus group meeting, Hutchinson approached Woods

and informed her that one of Hudson's coworkers, Heather Howard, had reported that

Hudson recorded the June 13 focus group meeting with Hutchinson.  (Woods Dep.

---

[11] Hudson testified that she also voiced the following complaints to Woods:

> Well, there was a lot of – a lot of friction, a lot of morale – the morale was
> very low.   And Jasmine did mention at one time that her and Barbara
> discussed the morale in the area was low at one time and that it must be low
> again.  I did let her know about how blacks – black African Americans were
> treated differently than the whites, as it related to productivity to work, what
> workloads, as it related to demeanor, how they treated, talked to black
> African-Americans versus whites, and as it related to promotions, blacks
> going to other positions and whites, you know being in positions within a
> year and a half and being promoted to exempts or in other positions.

> The workload was more, we had more workload than the white Caucasians.
> They tend to finish their work quicker . . . while we struggled, although I was
> very on top of my job or tried to be, struggled to complete our work.  We had
> more groups than the white Caucasians.

> I discussed [with Woods] the differences in how blacks were treated within
> the area . . . I can't recall my exact words, but the overall area of – the overall
> – overall that was going on in the area was told to Jasmine Woods, overall,
> what was going on . . . Okay, I do not recall exactly what was told, anything
> – any and everything that was going on at that time was told to Jasmine.

(Hudson Dep. at 198-200).  Hudson later admitted in her deposition that she made no complaints to
Woods about having more work than other associates, and that she never complained to Woods that
she was discriminatorily denied promotions.  (Hudson Dep. at 306-307, 343).

at 88-89; Hutchinson Dep. at 77-78; Howard Dep. at 16-17).   According to Blue Cross's internal policies "[i]n order to protect the privacy of its associates, subscribers, and providers; the confidentiality of medical information; and the communications between patients, physicians, and other health care providers, the use of cameras, tape recorders, or other audio-visual equipment in any Company facility is not allowed without prior approval of the Company President and/or the Vice President of Human Resources."   The policy further states that any violation thereof will "subject the associate to disciplinary action up to and including discharge." (Exh. 15 to Hudson Dep. at 190).

Because of the information that Hudson had recorded the meeting, and in light of Blue Cross's policy against recording and Hudson's very detailed notes which Woods believed resembled a verbatim transcript, Woods believed she had sufficient cause to conduct an investigation into the allegation that Hudson had recorded the meeting.  (Woods Dep. at 119-120; Woods Aff., ¶ 7).

On or about June 26, 2006, Woods called Hudson into her office and suspended her employment with pay in the presence if Hutchinson, on the grounds that Hudson had violated the Company's audio-visual policy. (Hudson Dep. at 274-275).  At that time, Hudson inquired into the status of the investigation into her complaint of a hostile work environment and was informed by Woods that "this

supersedes your investigation." (Hudson Dep. at 274-275).

### 1.      The Internal Investigation

Woods interviewed four of Hudson's coworkers as part of the investigation into the allegation that Hudson had recorded the meeting. Heather Howard, Jennifer White, Tricia Isbell, and Angela Fincher, all of whom had work stations near Hudson, were interviewed. (Howard Dep. at 20, 24; Fincher Dep. at 22, 29; Isbell Dep. at 21, 26). Howard told Woods that she had overheard Isbell say that Hudson had recorded a conversation with Hutchinson. (Howard Dep. at 16-17; Exhs. 24, 25 to Howard Dep.). Howard never heard Hudson herself say she had recorded the meeting, never saw a recording device in Hudson's possession, and never saw a purported transcript of the hearing. (Howard Dep. at 21-22).

Woods' interview notes from her conversation with Isbell reflect that Isbell directly heard Hudson state that she had recorded her focus group meeting with Hutchinson, and that Isbell saw what she described as a transcript of the meeting, as it was in question and answer format. (Isbell Dep. at 21-26, 38-40; Exhs. 22, 23 to Isbell Dep.). In a follow-up email to Woods, Isbell wrote: "I am not sure how many people may have seen or overheard the conversation or read the transcript but I do know that both were done at Tomorrow's desk early in the morning. The only people I know for sure, other than myself, that knew about the recording of the conversation

29

was Angela Fincher and Jennifer White, and both of these people sit by Tomorrow and me." (Pl.'s Exh. M).  Isbell testified in her deposition that she actually overheard Hudson state that she recorded this meeting, rather than having been informed so directly by Hudson.  (Isbell Dep. at 25-26).

Woods also interviewed Angela Fincher.  Fincher told Woods that she witnessed Hudson state that she planned to record her focus group meeting, and she also reported that she witnessed Hudson with a tape recorder in her hand as she made the statement.[12]  (Fincher Dep. at 16, 19-23; Exhs. 20, 21 to Fincher Dep.).

Jennifer White was also interviewed about the purportedly tape-recorded conversation.  White neither confirmed nor denied that Hudson made any remarks about recording her focus group meeting, and stated that she had no recollection of any specific comment.  (White Dep. at 104-105; Exh. 31 to Woods Dep.).  Woods did not conclude that White's statement was inconsistent with that of Isbell or Fincher because they had reported that White may have knowledge of the conversation based only on the proximity of her work station to Hudson's.  (Woods Dep. at 110).

_____

[12] Hudson does not deny that she may have mentioned an intention to record Hutchinson prior to her actual meeting, but maintains that she chose not to do so after speaking with Woods on the matter.  (Hudson Dep. at 240-243, 277).  Fincher does not recall any conversation during which Hudson told her that she *had* recorded Hudson.  (Fincher Dep. at 23).

### 2.     The Termination Decision

At the conclusion of the interviews Woods made the determination that Hudson's employment with Blue Cross should be terminated for violation of the audio-visual policy.  (Woods Decl., ¶ 7).  Woods based this decision on the fact that Hudson had asked Woods if she could record her conversation with management, Woods advised her not to do so, and Hudson provided Woods with a detailed question and answer manuscript of her focus-group meeting with Hutchinson. (Woods Decl., ¶ 7; Woods Dep. at 60, 119-120).  At the time she was presented with Hudson's detailed notes, Woods inquired as to how she was able to have captured her focus group meeting in such detail, to which Hudson responded that she wrote quickly and asked Hutchinson to slow down when necessary.  (Woods Dep. at 86-87; Hudson Dep. at 239-240, 243; Woods Decl., ¶ 7).  While Woods was satisfied with Hudson's explanation at that time, later, in the face of witness accounts that Hudson had stated she *would* record the meeting, as well as Hudson's statement that she *had* recorded the meeting, Woods concluded that she had done so.  (Woods Dep. at 119-120; Woods Decl., ¶ 7).

On July 14, 2006 Woods called Hudson to notify her that the company had

decided to terminate her employment for violation of its audio-visual policy.[13]

(Hudson Dep. at 281, 284-285; Woods Dep. at 121; Woods Decl., ¶ 7).

### J.   Hudson Seeks Redress

After her termination, Hudson sought unemployment compensation benefits,

which were contested by Blue Cross.  (Pl.'s Exh. R).  After a telephone hearing

before Administrative Officer David L. Lee, it was determined by the State of

Alabama Department of Industrial Relations Hearings and Appeals Division that "the

claimant [Hudson] did not violate the [audio-visual] policy."  (Pl.'s Exh. R).

Hudson filed a charge of discrimination with the EEOC on September 26,

2006.  (Hudson Dep. at 289; Exh. 35 to Hudson Dep.).  In her Charge, Hudson claims

that she made complaints of a racially hostile work environment and race

discrimination by her supervisor, and that while her claim was supposed to have been

investigated by Blue Cross, her supervisor Hutchinson falsely accused her of

---

[13] Crissy Garrett (African American) is the only other Blue Cross employee disciplined for violating the audio-visual policy.  (Johnson Decl., ¶ 5).  Garrett believed that her co-workers were making physically threatening statements to her when management was not in the area, and placed a recorder on her desk in an effort to memorialize those alleged statements. (Johnson Decl., ¶ 3). When Garrett brought the recording to Johnson, Johnson believed that Garrett was reporting a credible complaint of workplace violence, and that Garrett was unaware of the company's audio-visual policy prohibiting tape recordings.  (Johnson Decl., ¶¶ 4, 5).  In light of what she considered to be mitigating factors, Johnson disciplined Garrett with a written warning rather than terminating her employment.  (Johnson Decl., ¶ 5).

recording a meeting during which she was reporting her mistreatment. Hudson claims that the false accusation served as the basis for her termination, in retaliation for complaining of racial mistreatment. (Exh. 35 to Hudson Dep.).

The EEOC issued a Notice of Right to Sue to Hudson on February 26, 2009 and she filed the instant action on May 11, 2009. (*See* Compl.). The Commission, after conducting its investigation, found cause to believe that Hudson's rights under Title VII had been violated, and that she had not participated in any recording, as claimed by Blue Cross. (Pl.'s Exh. T).

IV.    **Applicable Substantive Law and Discussion**

Plaintiff asserts that Blue Cross failed to redress her complaints of a racially hostile working environment and subsequently terminated her employment in retaliation for having opposed illegal discrimination. (*See* Doc. #34 at 1). Each of those claims are considered in turn below.

A.    **Hostile Work Environment in the form of Racial Harassment under Title VII**

In order to establish a *prima facie* case of hostile environment in the form of racial harassment, Plaintiff Hudson must demonstrate: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the

terms and conditions of employment and create a racially abusive work environment; and (5) a basis for holding the employer liable.  *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).  Such showing arises only where the racial harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (citation omitted). The standard is "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citation omitted). For example, offhand comments, isolated incidents (unless extremely serious), and other similar tribulations of the workplace will not amount to changes altering the terms and conditions of employment.  *Faragher*, 524 U.S. at 788.  Furthermore, in order to be actionable under the statute, the work environment must be offensive on both an objective[14] and a subjective level.  That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787.  This is a question to be determined with regard to the

---

[14] The objective evaluation is based on a "reasonable person" standard.  *Watkins v. Borden*, 105 F.3d 1344, 1355-56 (11th Cir. 1997) (affirming the use of the "reasonable person" standard in a hostile work environment claim where the plaintiff argued that the court should have applied a more contextual standard such as "a reasonable African-American person.")

totality of the circumstances. *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).

The Eleventh Circuit has specified the following factors to consider in determining whether an environment is hostile: (1) the frequency of the discriminatory conduct, (2) the severity of the discriminatory conduct, (3) whether the conduct is threatening or humiliating or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the plaintiff's performance at work. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995). The undisputed facts in this case indicate that the work atmosphere was neither "charged with racial hostility" nor abusive. *Edwards*, 49 F.3d at 1521. The Supreme Court has repeatedly emphasized that this cause of action is limited to extreme work conditions. *See, e.g., Faragher*, 524 U.S. at 788; *Oncale*, 523 U.S. at 81.

The alleged harassment of Plaintiff comes from a handful of isolated incidents:[15] (1) Hudson felt that she was being overly scrutinized with regard to time

---

[15] Plaintiff's brief in opposition to the motion for summary judgment does not specifically delineate those comments and actions of Russell which Plaintiff contends were racially hostile. Instead, the brief summarily states: "Hudson testified on several occasions in her deposition that the issue of racial discrimination was discussed in their meetings;" "Ms. Hudson's notes describe (in bold type) some of her complaints of racial inequality in Ms. Russell's department;" "The plaintiff's testimony is clear that Ms. Russell's actions had an adverse impact on her ability to perform her job;" "Ms. Hudson felt she was 'walking on pins and needles' during her time at work because of the treatment she received at the hands of Ms. Russell;" "The mere fact that Ms. Hudson spent so much time (apparently in vain) trying to correct the problem makes it clear that her working conditions were altered sufficiently to 'make it more difficult to do [her] job.'" (Doc. #34 at 24-26). As a result,

spent away from her desk, while unnamed white employees were not (Hudson Dep. at 308; Exh. 31 to Russell Dep.); (2) during a luncheon, Hudson's pay grade was announced to a group by her supervisor and similarly situated white employees did not have such information divulged about them (Hudson Dep. at 93-94); (3) Russell touched Hudson's hair saying she "had never touched a black woman's hair before" (Hudson Dep. at 265); (4) Russell treated African American employees differently because she talked to Caucasian employees on a daily basis and communicated to them "in a different style" (Hudson Dep. at 169-170, 172-173); (5) Russell made a "big deal" out of African American employees asking for time off, while not doing the same when addressed with Caucasian requests (Hudson Dep. at 96-100); (6) African Americans were assigned "more work" than Caucasians (Hudson Dep. at 197); (7) certain verbiage in her performance evaluation that accuses her of being rude to customers was undeserved; and (8) Russell said to Hudson "[Y]ou are so slim, you know, I hate you, you are just so skinny and we are the same age and I am just so fat." (Hudson Dep. at 174-175).

The problems with Hudson's claim of a hostile working environment are multi-fold.  First, there is no proof, only Hudson's broad, self-serving assertion, that the

---

the court was left to shore up all of the comments and conduct that could possibly have been construed by Plaintiff as racially discriminatory.

complained-of conduct was grounded in a preference for one race over the other. No comparators are named, for instance, of a Caucasian employee whose work load was purportedly less than that of Hudson nor of a Caucasian employee who enjoyed greater leniency with respect to time off from work than Hudson or a Caucasian employee who was not scrutinized for time spent away from her desk. In fact, Hudson admitted that she was never denied any time off which she requested and also admitted that she was never disciplined or counseled for time spent away from her desk.[16]   (Hudson Dep. at 97-99, 98-101, 298-299, 308-309). The *only* comparator named in the record is Jason Henderson, a white male, who also complained about his performance evaluation. (Hudson Dep. at 301-302; Hutchinson Decl., ¶ 9). There is no evidence, however, as to the nature of Henderson's complaint or as to the nature of any remedy he was given or denied. Moreover, Hudson is unaware as to whether Henderson was treated differently with regard to a change of verbiage in his performance evaluation and admitted that she was aware that Henderson remained so dissatisfied with management's response to his complaint that he bid on a transfer to another department. (Hudson Dep. at 301-302; Hutchinson Decl., ¶ 9).

---

[16] The only incidents that Hudson points to as proof of herself being scrutinized for time spent away from her desk is one in which Russell glanced at her watch when Hudson arrived at her work station (Hudson Dep. at 170) and another in which Russell reportedly told Hudson that she had the most requests for time off over anyone else in the department (Exh. 31 to Hudson Dep.).

Another of the problems for Hudson is that her complaints of behavior of disparate treatment would have been more appropriately brought as, not surprisingly, claims for disparate treatment, but instead have been characterized as hostile work environment.[17]   *See McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008). Perhaps she did that because she missed the disparate treatment claim boat by failing to file charges of discrimination with the EEOC within 180 days of the alleged discriminatory conduct.  Or perhaps she used the hostile work environment umbrella because she knew she did not or could not present evidence of comparators. Regardless, her claim cannot survive under either rubric – both require Rule 56 evidence that Plaintiff suffered some discrimination on the basis of race.  *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The comments made by Russell to Plaintiff are subject to a slightly different

---

[17] The court reminds counsel for Plaintiff that "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990) ("Appellant suggests that where a party includes information in declarations or affidavits related to a summary judgment motion which might form the basis of an argument or defense, but the party fails to articulate such an argument, the district court may nevertheless be required to consider the argument based on Rule 15(b) and can be reversed on appeal for failing to do so. Taking appellant's contention to its logical conclusion would render the summary judgment process an exercise in futility, and would place the onus on the district court to distill any possible argument which could be made based on the materials before the court. Presenting such arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court, and Rule 15(b) provides no basis for this court to consider appellant's change of circumstances argument for the first time on appeal.").

analysis.  As previously stated, a valuation of the objective severity of the events

which allegedly constitute a hostile work environment involves consideration of the

totality of the circumstances.  Here, the situations described by Hudson, assuming that

they did have some basis in race and taken at face value, were neither severe nor

pervasive.  (*See* Hudson Dep. at 96-100, 169-170, 197,  308).  The comments made

– one asking to touch Hudson's hair, one about her pay grade, and another about

Hudson's slender figure[18] – are, quite obviously, not so "overt and denigrating and

[] pervasive and shocking" to create an atmosphere charged with racial hostility.

*EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1070 (11th Cir. 1990).   No

reasonable person could harbor an objectively reasonable belief that such comments

constituted harassment under the law of the Eleventh Circuit.  *See Tatt v. Atlanta Gas*

*Co.*, 138 Fed. Appx. 145, 148-149 (11th Cir. 2005).  As such, it is of no import that

Hudson felt she was "walking on pins and needles" and found it more difficult to do

her job during her time at work because of the purported treatment she received at the

hands of Russell.  (*See* Doc. #34 at 26); *see also Rojas v. Florida*, 285 F.3d 1339,

---

[18] Of course, these last two comments about Hudson's pay grade and figure, fairly characterized, have absolutely no relationship to Hudson's race.  As such, they cannot even be considered in support of Plaintiff's hostile environment claim.  Because Title VII does not regulate the "general civility" of employees, *see Faragher*, 524 U.S. at 788, conduct that may be counted as contributing to a hostile environment *must be of a race-related nature* and not "[i]nnocuous statements or conduct" that bear no relation to race, *see Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

1344 (11th Cir. 2002) (a mere subjective perception that unfair treatment is based on race is not evidence sufficient to prove a hostile work environment).

On these facts, the record does not demonstrate that Plaintiff was exposed to sufficiently egregious conduct to support a hostile environment claim. Instead, the record demonstrates, at best, that Hudson was forced to bear the tribulations of a supervisor with whom she frequently disagreed and had a personality conflict with. *See Faragher*, 524 U.S. at 788. Summary judgment is appropriate because Plaintiff's allegations fall below the *Mendoza* line.[19]  *Mendoza*, 195 F.3d at 1247-48.

## B.    Retaliation under Title VII

Title VII prohibits an employer from discriminating against any individual for participation in or opposition to unlawful employment practices.  *See* 42 U.S.C. § 2000e-3(a).   Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee "because [she] has opposed any practice made an unlawful employment practice" by Title VII, including discrimination on the basis of race.  42 U.S.C. § 2000e-3(a).  The goal of this provision is to "prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure

---

[19] Because it is abundantly clear that Plaintiff's claims cannot meet the severe or pervasive prong of the hostile work environment analysis, this court need not analyze whether Blue Cross exercised reasonable care to correct promptly any harassing behavior as would be required for assertion of the affirmative defense. *See Faragher v. City of Boca Raton*, 524 U.S. 777 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

or advance enforcement of the Act's basic guarantees," including freedom from race discrimination. *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2412, 165 L.Ed.2d 345 (2006).

Retaliation is a separate offense under both statutes. *Meeks v. Computer Assocs.*, 15 F.3d 1013, 1021 (11th Cir.1994) (citing 42 U.S.C. § 2000e-3(a)). "An employee need not prove the underlying claim of discrimination for the retaliation claim to succeed." *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999) (citations omitted).

To establish a *prima facie* case of retaliation, Plaintiff must show: (1) that she engaged in protected activity or expression; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally connected to the protected conduct. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998); *see also Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). If Plaintiff is able to advance a *prima facie* case of retaliation, the burden then shifts in accordance with *McDonnell Douglas* to Blue Cross to articulate legitimate, non-discriminatory reasons for the alleged retaliatory acts. *See Phillips v. Aaron Rents, Inc.*, 262 Fed. Appx. 202, 210 (11th Cir. Jan. 11, 2008) ("Retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework.") (citing *Holifield*, 115 F.3d at 1566). Upon

41

articulation, Plaintiff must demonstrate that Blue Cross's proffered explanation is a pretext for retaliation in order for her claim to survive summary judgment. *See id.* That is, the plaintiff must then "demonstrate that [she] will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (citation and internal quotation omitted).

### 1.     The Prima Facie Case

### a.     Statutorily Protected Expression

Although not specifically fleshed out in her brief in opposition to summary judgment, Hudson made complaints to superiors on six occasions.[20]

- Sometime in 2004 or 2005, Hudson complained to Natalie Hill in Human Resources that Russell made a remark during a luncheon about Hudson's pay grade.  No mention was made of race.  (Hudson Dep. at 93-95, 300).

- In 2006, after Hudson received her Performance Evaluation, she complained about the section cataloguing rudeness to customers to Barbara Hutchinson.  (Hudson Dep. at 156-158; Exh. 25 to Hudson

---

[20]Although Hudson has numerous complaints about Amy Russell during the period of time she worked in that department, outlined here are only those complaints Hudson actually voiced to superiors.

Dep.).  There is no evidence that Hudson complained to Hutchinson that the verbiage was included because of Hudson's race, although she did have "feelings" that the meeting was handled "as related to black versus white."  (Hudson Dep. at 163, 167-168).

· Hudson met with Jasmine Woods on April 10, 2006 to further discuss her disagreement with the contested verbiage in the Performance Evaluation.  (Hudson Dep. at 164; Woods Decl., ¶ 3).  Hudson can not recall whether she lodged any race-based complaints at that time.[21] (Hudson Dep. at 181-183).

· Hudson provided Woods with a written summary of Hudson's own notes on April 24, 2006.  (Hudson Dep. at 194-195; Exh. 28 to Hudson Dep.).  The notes convey Hudson's dissatisfaction with her 2006 Performance Evaluation.  (Hudson Dep. at 186-187; Exh. 28 to Hudson Dep.).  The notes do not provide any allegation that Hudson's complaint was in any way related to her race.  (Hudson Dep. at 191-192; Exh. 28 to Hudson Dep.).  Hudson testified that she could not recall what she discussed with Woods beyond the general complaint regarding the

---

[21] This fact is stated in the manner most favorable to the Plaintiff.  Earlier in her deposition, Hudson testified that she did not complain to Woods at this time of any conduct suffered on the basis of race.  (Hudson Dep. at 181-183).

contested verbiage.  (Hudson Dep. at 204-205).

- In late May 2006, after she was formally counseled by Hutchinson and Russell, Hudson sought the advice of Woods.  (Hudson Dep. at 221-222).  She made some general complaints about Russell, and then asked to be removed from Russell's management "for I feel retaliation will be done to me."  (Pl.'s Exh. F).  When asked whether she complained of a hostile work environment based on her race, Hudson testified: "I can't recall if I said race or just hostile environment . . . [r]ace was a factor, she knew about race."[22]  (Hudson Dep. at 225).

- On June 14, 2006, Hudson met again with Woods to discuss "how blacks were treated in the area, I mean, several things were discussed." (Hudson Dep. at 253; Exh. 33 to Hudson Dep.).  Woods informed Hudson that she would start an investigation of the allegations of a hostile work environment.  (Hudson Dep. at 253).[23]

The only time which Plaintiff has presented sufficient Rule 56 evidence to

_____

[22] Woods' notes from this meeting with Hudson do not reveal that Hudson complained about a hostile work environment on the basis of race.  (Pl.'s Exh. G).  Because this fact is in dispute, it is stated above in the manner most favorable to the Plaintiff.

[23] This is another disputed fact stated in the manner most favorable to the Plaintiff. According to Woods, she informed Hudson during the meeting that she did not have sufficient information upon which to launch a hostile work environment investigation.  (Woods Dep. at 26, 60-61, 73; Exhs. 27, 28 to Woods Dep.; Woods Decl., ¶ 5).

establish that she engaged in protected expression was when she met with Woods on June 14, 2006. The other complaints can not be considered protected activity. Not every complaint about conditions in the workplace, legitimate or otherwise, constitutes protected activity; retaliation in response to an activity that is not protected does not support a retaliation claim. The complaints previous to that on June 14, 2006 fail to disclose that Hudson's complaints are grounded in racial harassment, instead setting out behavior of a supervisor who at most had a personality conflict with Hudson. Therefore, those complaints cannot satisfy the protected expression element of the retaliation prima facie case.[24] *See Van Portfliet v. H&R Block Mortg. Corp.*, 290 Fed. Appx. 301, 304 (11th Cir. Aug. 21, 2008) ("[B]ecause reporting the undisclosed racial slur failed to satisfy the statutorily protected expression requirement, that expression can support no retaliation claim as a matter of law."); *see also Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("Statutorily protected expression includes internal complaints of sexual harassment to superiors as well as complaints lodged with the EEOC . . ."); *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1075 (11th Cir. 1995) ("Unfair

---

[24] Blue Cross cannot be asked to infer that discrimination occurred. *See Demers v. Adams Homes of Northwest Fla., Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009) (To engage in protected activity, the employee must, "at the very least," communicate her belief that discrimination is occurring to the employer and cannot rely on the employer to "infer that discrimination has occurred.").

45

treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII."); *Wehunt v. R.W. Page Corp.*, 352 F.Supp.2d 1342, 1358 (M.D. Ga. 2004) ("At a minimum, an employee must communicate to her employer her belief that discrimination was occurring.  It is not enough to simply complain in a racially neutral way about an employer's practices, and then expect the employer to speculate as to whether such complaints may be motivated by an employee's subjective and undisclosed belief that the employer was engaged in race discrimination.").

> ### b.    Adverse Employment Action and Causal Connection

Hudson suffered an adverse employment action when her employment with Blue Cross was terminated on July 14, 2006.  Termination is, of course, an action "that would have been materially adverse to a reasonable employee or job applicant.  In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  548 U.S. 53 (2006); *see also Bush v. Regis Corp.*, 257 Fed. Appx. 219, 222 (11th Cir. Dec. 3, 2007); *Taylor v. Roche*, 196 Fed. Appx. 799, 802 (11th Cir. Sept. 12, 2006).  Moreover, the termination is not, for purposes of summary judgment, **"**wholly unrelated" to the protected activity.  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Brungart v. BellSouth*

*Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  The complaint was made on June 13, 2006, and exactly one month later, Hudson's employment with the company was terminated.  (*See* Hudson Dep. at 281, 284-285; Woods Dep. at 121; Woods Decl., ¶ 7).  Plaintiff's complaint of retaliation survives the *prima facie* case, and the burden shifts to Blue Cross to articulate a legitimate, non-discriminatory reason for discharging Hudson from her employment at Blue Cross.

### 2.   Blue Cross's Articulated Legitimate Nondiscriminatory Reasons for the Termination of Employment

When Blue Cross terminated Plaintiff's employment on July 14, 2006, it reportedly did so because Plaintiff had violated the company's audio-visual policy by recording a conversation with management.  (*See* Hudson Dep. at 281, 284-285; Woods Dep. at 121; Woods Decl., ¶7).  Courts have consistently held such violations of work rules to be legitimate, non-discriminatory reasons for adverse actions.  *See Burdine*, 450 U.S. at 256.  Therefore, Blue Cross has met its burden of articulation, the presumption of discrimination created by the prima facie case is destroyed, and the burden shifts back to Hudson to show by a preponderance of the evidence that prohibited, retaliatory conduct motivated the decision to terminate her employment.  *See Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).

To establish pretext, a plaintiff must "present concrete evidence in the form of

47

specific facts" showing that the defendant's proffered reason was pretextual. *See Bryant v. Jones,* 575 F.3d 1281, 1308 (11th Cir. 2009); *see also Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 771 (11th Cir.2005) (A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1088 (11th Cir.2004). Conclusory allegations and assertions are insufficient. *See Bryant,* 575 F.3d at 1308.

As evidence of pretext, Plaintiff contends: (1) the witness statements collected by Woods in support of the termination decision are inconsistent; (2) Plaintiff did not record the contested meeting with management; and (3) violation of the company's audio-visual policy is not listed as an "intolerable offense" in the Associate Handbook.[25] (*See* Doc. #34 at 30-31). These arguments seem to be centered on the

---

[25] Finally, Hudson's own "feelings" that her status as a black employee in the office had something to do with Russell's management of her is ungrounded in factual support and merely Hudson's own perception. (*See* Hudson Dep. at 163,167-170; Exh. 31 to Russell Dep.). *See Kelliher v. Veneman*, 313 F.3d 1270, 1276 n. 8 (11th Cir. 2002) (plaintiff's assertion that his supervisor was "out to get him" did not prove pretext for age or race discrimination). Such conclusory allegation is, of course, insufficient to establish pretext. *See also Thomas v. Miami Veterans Med. Cntr.*, 290 Fed. Appx. 317, 320 (11th Cir. Aug. 26, 2008) (conclusory allegations insufficient to support pretext); *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th

theory that Blue Cross's stated reasons for the demotion are unworthy of belief.  *See*

*Burdine*, 450 U.S. at 256.

The arguments fail on a very basic level – they do nothing to address the fact

that Blue Cross actually believed that Hudson violated the audio-visual policy and

that Blue Cross found such violation to be a serious offense.[26]  While Plaintiff makes

abundantly clear her disagreement with the wisdom of Blue Cross for terminating her

employment for an act that she contends did not occur, she does nothing to address

the fact that Blue Cross believed she committed the infraction.  *See Alexander v.*

*Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000); *see also Holifield v. Reno*,

115 F.3d 1555, 1565 (11th Cir. 1997) (the pretext inquiry centers upon the

employer's beliefs, and not the employee's own perceptions of her performance);

*Harrison v. Int'l Business Machines (IBM) Corp.*, 2010 WL 1852589, Nos. 09-11762,

09-11778 at *3 (11th Cir. May 11, 2010) ("[The employer's] legitimate,

nondiscriminatory reasons for its actions were that [plaintiff] refused to complete

---

Cir. 1996) (conclusory allegations, without more, are insufficient to show pretext).

[26] Whether or not Blue Cross's policy actually states that recording is an "intolerable offense" is not enough to get Plaintiff over the pretext hurdle.  "Even assuming that [the company] did deviate from its policy, this deviation does not raise an inference of discrimination.  Standing alone, deviation from a company policy does not demonstrate discriminatory animus."  *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir. 1999).  There is ample evidence in the record that Blue Cross considered recording in the office place a serious offense.  (*See* Exh. 15 to Hudson Dep. at 190; Johnson Decl., ¶¶ 3, 4, 5).

work assignments, ignored parts of his assignments, refused to accept new assignments, engaged in altercations with coworkers, and refused to give any updates on the progress of his work . . . [Plaintiff] simply cannot rebut the logical conclusion that . . . supervisors at [the company] took the actions they did because they honestly believed [plaintiff] to be a poor employee.").  Whether Hudson actually violated the company's audio-visual policy is not an issue for this court to referee.  *See Wilson v. B/E Aerospace*, 376 F.3d 1079, 1092 (11th Cir. 2004); *see also Holmes v. West Palm Beach Hous. Auth.*, 309 F.3d 752, 755 (11th Cir.2002) ("An employer articulates a legitimate nondiscriminatory reason for termination where the employer had an honest, good faith belief in the reason for termination, even if it turns out that the employer was mistaken in that belief."); *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir.2000) ("'Pretext is not demonstrated by showing simply that the employer was mistaken.'") (quoting *Sempier v. Johnson & Higgins,* 45 F.3d 724, 731 (3d Cir.1995)); *Abel v. Dubberly*, 210 F.3d 1334, 1338-1339 (11th Cir. 2000) ("An employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation"); *Turner v. Texas Instruments*, *Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977) (Even if an employer wrongly believes that a plaintiff violated its policy, if the employer acted on its good faith belief it is not guilty of discrimination).  A discrimination plaintiff cannot establish

pretext by simply asserting that her employer may have been or was mistaken.  *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991 (noting that courts do not second guess an employer's business judgment and that plaintiff cannot establish pretext merely by demonstrating that a reported work rule violation did not occur). That is all Plaintiff has done here.

The legitimacy of Blue Cross's reason for terminating Hudson's employment is further highlighted by the fact that, contrary to Plaintiff's assertions otherwise, Blue Cross had reason to believe, in addition to the witness statements, that Hudson had violated the audio-visual policy.  (*See* Woods Decl. at ¶ 7).  Hudson had provided Woods "with a very detailed, typed, question-and-answer manuscript containing what appeared to be a verbatim reflection of a meeting [Hudson] had with Barbara Hutchinson."  (Woods Decl., ¶ 7).  Although Woods "accepted [the] explanation" at the time, when faced with even one statement from a co-worker that Hudson *had* recorded the conversation, she quickly concluded that a full investigation into the matter was necessary.  (Woods Decl., ¶ 7).  That Woods already had some, however slight, suspicion that the interview had been recorded lends credence to the fact that even a single statement from one co-worker of Hudson's would lead Woods to the conclusion that Hudson had not been truthful and had in fact recorded the conversation.  (*See* Woods Decl., ¶ 8).

Hudson has not created a genuine issue of material fact as to whether Blue Cross's articulated reason for the termination was pretextual. *See Chapman*, 229 F.3d at 1024-25.  Therefore, Blue Cross's motion for summary judgment, as it relates to the retaliation claim, is due to be granted.

## V.   __Conclusion__

For the reasons asserted above, there being no dispute as to any material fact, Defendant Blue Cross Blue Shield of Alabama's Motion (Doc. #21) for Summary Judgment is due to be granted.

A separate order will be entered dismissing all claims.

**DONE** this the ___14th___ day of December, 2010.

_____

SENIOR UNITED STATES DISTRICT JUDGE